(133 So. 718)

## PITCHFORD v. PITCHFORD.
### 6 Div. 760.

Supreme Court of Alabama.
March 12, 1931.

Rehearing Denied April 9, 1931.

Fort, Beddow & Ray, of Birmingham, for appellant.

Altman & Koenig, of Birmingham, for appellee.

**BROWN, J.**

The original bill, filed by the wife against the husband, sought a divorce on the grounds of cruelty, and prayed that the custody of the two minor children, the issue of the marriage, who were in the complainant's custody at the filing of the bill and so remained until the rendition of the final decree, be committed to her.

The respondent answered, denying the alleged cruelty, but admitted that the complainant was a suitable person to retain the custody of their children.

Thereafter the complainant amended her bill, charging adultery on the part of the defendant with one Kate Gregory. The defendant thereupon amended his answer, making it a cross-bill, withdrawing his admissions that complainant was a suitable person to have the custody of the children, and alleging that the complainant had been guilty of adultery with one J. V. Forbes, and praying that he be granted a divorce.

On the hearing the trial court entered a decree denying the complainant relief and dismissing her bill. The defendant was granted a divorce as prayed in the cross-bill; the children were taken from the mother and committed to the custody of the defendant's mother and step-father.

This appeal is prosecuted by the complainant, and errors are assigned, predicated on the denial of relief to her and the granting of the relief on the cross-bill.

The evidence, in the main, was the testimony of witnesses taken orally in open court, and is quite voluminous. We deem it necessary to state only the controlling facts that influence our conclusion.

The defendant is a medical doctor, and at the time of the separation and for several years prior thereto was in the employ of one of the large industrial corporations in the Birmingham district. Just before the marriage, the complainant, then a young woman of 20, was graduated as a nurse, and the defendant had just finished his medical course and had entered upon the practice of his profession. For two years after the marriage they lived to themselves, away from the defendant's parents, during which time the first child was born. In 1923, the defendant with his wife and child moved into the home of his parents, Mr. and Mrs. Davis, in the city of Birmingham, where they lived until the separation, which occurred in the summer of 1929. The trouble which ultimately resulted in the separation was first manifested in 1928, when, according to some of the testimony, the husband began to display temper and irritabil-

ity; and there is also testimony going to show that the defendant's parents, from the beginning, were not always kind and considerate of the complainant.

However, the testimony offered by complainant to sustain the charge of cruelty alleged in the original bill falls short of the requirements of the statute. It shows, at most, increasing incompatibility between the parties, characterized by impatience and violent displays of temper on the part of the husband. To sustain the charge of cruelty, it was incumbent on the complainant to show actual violence upon her person, attended with danger to life or health, or conduct on the part of the defendant affording reasonable apprehension of such violence. Code 1923, § 7409; Morrison v. Morrison, 165 Ala. 191, 51 So. 743.

Whatever may be thought of the testimony offered by the complainant supporting the charge of adultery made in the bill as amended, the judgment here is, assuming that the charge was established, that it has been condoned. Complainant's testimony is to the effect that she learned of the defendant's alleged infidelity through a letter written by the attorney of Gregory, the husband of Kate Gregory, addressed to the defendant in respect to a pending suit by Gregory against the defendant for alienation of his (Gregory's) wife's affection; that, after the receipt of this letter, she did not "live with" the respondent. Her evidence, however, goes to show that she remained with the respondent in the house of his parents, and that she implored him to move with her from their home. This in connection with the respondent's testimony that he and complainant cohabited as husband and wife, after she became aware of the charges of Gregory through said letter, induces the conclusion that the offense was condoned. This necessitated a denial of relief to her, and her bill was properly dismissed. Code 1923, § 7413.

Much of the testimony offered by the defendant in support of the alleged infidelity of the wife charged in the cross-bill relates to "parties," excursions to swimming pools, and the like, attended by the complainant. The purpose of this testimony was to show intimacy between complainant and Forbes, and also the use of intoxicants by the complainant. The sum total of this phase of the testimony serves to disclose the atmosphere of the home life of the Davises, into which the young wife was brought by the husband, and to bring into bold relief the personality of the dominating spirit, the husband's mother. It shows her to be an active successful business woman, engaged in the real estate and insurance business, to which she devoted all of her time, leaving the care of the home in the main to negro servants; that she had a wide business and social acquaintance,

whom she entertained and by whom she was entertained in a social way. If she was not the instigator of or inspiration for the "parties," the subject of this testimony, she was at least a moving spirit in them. Liquors of some sort were an incident of these entertainments, and the mother-in-law appears to be modern in her views, and partook of the beverages or not, as she expressed it, in substance, "as the etiquette of the occasion demanded." Without notable exception, every participant in these social functions was the friend of the mother-in-law and the husband, and the wife met them through the introduction of one or the other, not excluding Forbes.

▮ The evidence relied upon, in the main, to sustain the allegations of the cross-bill as last amended, was testimony given by private detectives employed by the husband to spy upon the wife, and for whose services, for one in his circumstances, he agreed to pay a considerable fee.

After the separation, the complainant moved into an apartment in the southern part of the city near St. Vincent's Hospital, where she lived with her children and a Mrs. Hoggle, a former girl friend who was taken as a roomer to aid in meeting her living expenses, supplementing the allowance of $100 per month by the husband. The evidence goes to show that, while the complainant, because of the alleged infidelity of her husband, had declared her purpose not to live with him, and though implored by him a few days before the trial to return to him on account of the children, she had refused to do so, yet she made no protest or effort to prevent the defendant from visiting the children and enjoying their company as often as he might desire. The testimony of witnesses Dan Bodeker and Warren is to the effect that on Saturday, March 29, 1930, after the defendant had called and obtained the consent of complainant to take the children with him on a trip to Atlanta, they kept the complainant under surveillance, that they were parked in a Cadillac sedan at the back of her apartment, and that at 9 o'clock, complainant and Mrs. Hoggle with a man, drove up in a car and parked and entered the apartment. One of these witnesses stationed in an automobile on the outside at the back of the apartment building claimed to have observed the flashing on and off of lights within, in different rooms, at suspicious intervals, that the shadows of moving figures were cast upon the window shades, and, while he was not able to state that he saw a man in the room, he testified that through a space between the shade and the sash he observed two hands go through the motion of striking a match and holding it up as a light, and that the hands, in his opinion, were the hands of a man.

Another detective, who arrived on the scene between 1 and 2 o'clock, and was stationed in the hall at the door of the apartment, gave testimony to the effect that he heard the occupants of the room get out of the bed and walk across the room in their bare feet; that he could distinguish between the footfalls of a man and a woman though they were barefooted, and in that way he determined that one of the occupants of the apartment on the occasion was a man.

No voices were heard, but one of the detective witnesses testified that he heard the hoarse cough of a man, and that the sounds of the bed springs were heard by some of these witnesses. There were two bedrooms in the apartment, and none of the witnesses undertakes to state which room the complainant was in, or that it was not Mrs. Hoggle in the room where they heard these suspicious noises.

About 2 or 3 o'clock in the morning some of these detectives tried to force an entrance into the apartment, which the complainant and Mrs. Hoggle refused to permit by threats of violence, and by turning into police headquarters a riot call for help. The complainant and Mrs. Hoggle, in person, reported the trespassers to the chief of police on the following day.

The detectives, after the police officers came, about 3 o'clock, left the apartment.

It may be noted that from 9 o'clock until about 12 there was no one at the front of the apartment or in the front hall, the usual way of egress and ingress, to affirm that the man who was seen to enter with complainant and her friend did not soon thereafter leave the apartment through the front hall. In the main this testimony may be fittingly characterized as mere deductions, and, while these witnesses assume to possess an uncanny perception, they do not undertake to distinguish between the bare footfalls of the two women, or whether the suspicious noises were caused by the complainant or her friend.

▮ It is in consonance with human experience and common sense that the testimony of private detectives cannot always be accepted at what, on first blush, appears to be its face value, and the authorities are agreed that it is to be weighed with great caution. 29 Am. & Eng. Ency. Law, 77; Underhill on Cr. Ev. §§ 4, 440.

Moreover, we feel safe in saying that the story of these detectives that two women, unless they were wholly devoid of character and a sense of ordinary decency, took a man to their rooms and shared his embrace in common, or that one permitted it in the presence and to the knowledge of the other, is incredible.

Opposed to the testimony of these witnesses is that of the complainant, Mrs. Hoggle, and Mrs. Diffley, the mother of complainant,

that Forbes nor any other man entered the apartment on the occasion testified to by said witnesses; that the three of them remained together in the apartment that night, the complainant and Mrs. Hoggle occupying one bed and Mrs. Diffley the other.

The testimony of Mrs. Diffley, woman of 70 years, was also to the effect that she was up at intervals during the night and turned on the light to go from her room to the bathroom.

The detective witnesses had no acquaintance with these women, and knew them only by description; and the evidence shows that from twenty to twenty-five people lived in the apartment building, and some of them were up late playing cards, and were passing to and from the apartment.

Therefore, indulging every reasonable presumption in favor of the conclusion reached by the trial court, we are unable to concur in the conclusion that the complainant, whose reputation prior to the trial was that of a good mother and a woman of good character, should be adjudged guilty of adultery.

The pertinent rule is that the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion that the act has been committed. Morrison v. Morrison, 95 Ala. 309, 10 So. 648; Le May v. Le May, 205 Ala. 694, 89 So. 49; Scott v. Scott, 215 Ala. 684, 112 So. 218.

The decree of the circuit court, in so far as it denies relief to the complainant appellant and dismisses her bill, is affirmed, and, in so far as it grants a divorce to the defendant appellee, it is reversed, and a decree is here entered dismissing the cross-bill and restoring the custody of the two minor children to the complainant, their mother. Le May v. Le May, supra. The appellee is taxed with the costs of the appeal and of the suit.

Affirmed in part, and in part reversed and rendered.

ANDERSON, C. J., and SAYRE and THOMAS, JJ., concur.